STATE OF CONNECTICUT *v.* JOHN LACCONE
(12667)

LANDAU, SPEAR and HENNESSY, Js.

22

Argued November 30, 1994—decision released February 21, 1995

*Neal Cone,* assistant public defender, for the appellant (defendant).

*Julia DiCocco Dewey,* assistant state's attorney, with whom, on the brief, were *John Connelly,* state's attorney, and *Corinne Klatt,* assistant state's attorney, for the appellee (state).

LANDAU, J. The defendant appeals from the judgment of conviction, rendered after a jury trial, of assault in the first degree in violation of General Statutes § 53a-59 (a) (3),[1] and risk of injury to a child in violation of General Statutes § 53-21.[2] The defendant claims

---

[1] General Statutes § 53a-59 (a) provides in pertinent part: "A person is guilty of assault in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life he recklessly engages in conduct which creates a risk of death to another person, and thereby causes serious physical injury to another person . . . ."

[2] General Statutes § 53-21 provides: "Any person who wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that its life or limb is endangered, or its health is likely to be injured, or its morals likely to be impaired, or does any act likely to impair the health or morals of any such child, shall be fined not more than five hundred dollars or imprisoned not more than ten years or both."

that the trial court improperly (1) excluded a letter written by a state's witness and thereby restricted cross-examination of that witness on an issue directly related to her truthfulness, (2) unduly restricted the defendant's direct examination of a defense witness, and (3) diluted the state's burden of proof in its instructions to the jury.

The jury reasonably could have found the following facts. At 10:30 p.m. on December 25, 1991, two Waterbury police officers responded to a report of a child in distress at the apartment of the Chasse family. Upon arrival, the officers were directed by the defendant to the kitchen, where they found a motionless child bleeding from her mouth and nose with distinct facial bruises. The officers succeeded in resuscitating the child, after which they observed a visible bulging on the left side of her head, significant reddish bruises inside her left ear and bruises on the right side of her face.

Earlier that evening, the victim and her mother, Valerie Daigle, had attended a party with the defendant, his sister Tammy Chasse, other members of the Chasse family and Cynthia Mosman, a friend of the Chasses. At this time, the defendant and Daigle had been dating for about four months. At 9:45 p.m., the group left the party, intending to go to the Chasses' apartment. The defendant, Daigle and the victim rode together. En route, the defendant and Daigle argued and, upon arrival, Daigle went into the apartment alone.

Approximately five minutes later, the defendant walked into the apartment carrying the victim. He carried her into the kitchen, did not place her on the floor, and greeted his sister, Tammy Chasse. He then carried the victim into the bedroom, placed her on a bed and began to take off her snowsuit. Upon being placed

on the bed, the victim began to gasp for air. Chasse attempted mouth-to-mouth resuscitation, but the child began bleeding from the mouth and nose and, when laid on the kitchen table, the left side of her head began to swell. Mosman witnessed these events.

The defendant claimed that the victim's injuries occurred when he placed her on the floor in the kitchen after carrying her inside. He testified that the victim saw Chasse, became excited, began to run toward her and fell, hitting her head on the wooden sink cabinet. He claimed that, upon hitting her head, the victim made a moaning noise and looked surprised, but otherwise appeared to be all right. He then brought her into the bedroom to take off her snowsuit, at which point she stopped breathing. Tammy Chasse corroborated the defendant's version of these events.

Physician Marc Simms, medical director of the pediatric ambulatory care unit at St. Mary's Hospital, examined the victim the following morning. He diagnosed the victim as having suffered multiple trauma, including a skull fracture, brain contusions, extensive bleeding under the scalp, many bruises about the face, eyes, jaw and ear lobes, bruises around her left knee, the small of her back and left shoulder, and a fracture just above her right wrist. While most of those injuries were new, some, including the wrist fracture, had occurred prior to December 25.

Simms, who testified for the state, concluded that the victim's injuries were inconsistent with those that would be incurred by a child of her age and height running into a cabinet. He concluded that the injuries were not accidental and were caused by multiple impacts, including "a very severe impact" of her head against a hard, flat surface.

The victim was treated upon initial admission to St. Mary's Hospital by Neeta Patel, a pediatric resident.

Patel, also testifying for the state, agreed that the victim's injuries were caused by multiple trauma and not by a child of her size and age running into a cabinet. This opinion was also adopted by Alok Bhargava, a pediatric neurologist, who concluded that a significant amount of force caused the victim's head injuries. Finally, Betty Spivak, a physician and director of the pediatric intensive care unit at Hartford Hospital, testified that the victim's skull and brain injuries indicated a very powerful impact against a flat, smooth surface. Spivak concluded that, in order for the victim to have caused these injuries by running into a cabinet, she would have had to have been moving at approximately 22 m.p.h. Spivak agreed with Simms and Patel that while some of her injuries predated December 25, the victim's head injuries had occurred on that evening.

The defendant's expert, Robert Harkins, a physician engaged in family practice, testified after reviewing the victim's medical records, X rays and scans. He concluded that she suffered "a single episode of blunt trauma to cause the ear and scalp bruising and fracture of skull and contusion of brain." He further concluded that the victim had not been injured by child abuse and that her injuries were "reasonably explained or explainable by the reported trip, fall, and resuscitation attempts."

Following a jury trial, the defendant was convicted and sentenced to a total effective sentence of thirteen years incarceration, execution suspended after eight years, with five years probation. This appeal followed.

I

The defendant's initial claim is that the trial court improperly excluded from evidence a letter written by Mosman, a key state's witness.[3] To support this claim,

---

[3] Mosman was the only purported eyewitness who testified that the victim was never placed on the floor and did not incur her injuries by running

he asserts that the letter was admissible as a relevant prior inconsistent statement and as an admission of specific misconduct showing a lack of veracity. The defendant also maintains that the trial court's ruling excluding the letter violated his constitutional right to confront and cross-examine an adverse witness.

The following additional facts are relevant to this claim. Mosman testified on behalf of the state. At the time of the incident, she was an emancipated minor living with the Chasse family because of difficulties in her own home. The defendant cross-examined Mosman extensively regarding discrepancies in her direct examination as well as between her two written statements, one written for the police on the evening of the incident and one written subsequently at the request of Tammy Chasse.

When she was asked on cross-examination whether she considered herself to be a truthful person, Mosman responded that she did. The defendant then offered to introduce a letter signed by Mosman, dated November 21, 1991. The letter, which Mosman acknowledged having written, was addressed to Chasse and stated in part, "Dear Tammy, Thanks so much for telling me what I've been like. I am going to try hard to stop lying. I stopped doing other things so I can stop lying."

The state objected to the introduction of the letter, arguing that the defendant's use of it would be an improper method of impeaching Mosman's veracity. The state also asserted that no foundation had been laid for introduction of the letter. The court agreed that the defendant had not established a foundation and offered him an opportunity, in the absence of the jury, to do so. In so ruling, the court noted that the letter,

into the cabinet. Her testimony directly contradicted that of the defendant and Tammy Chasse, the only witnesses who claimed to have observed the victim fall against the cabinet.

absent a foundation, did not rebut Mosman's testimony that she considered herself at the time of trial to be a truthful person.

On cross-examination for the purpose of establishing a foundation, Mosman testified that at some point prior to November, 1991, Chasse had written her a letter accusing her of lying. The accusation was general, with no mention of a specific instance of lying. Mosman testified that her November 21 letter was in response to this accusation. In addition to maintaining that the accusation had been false, she explained that she had written what she had "in order to stay on [Chasse's] good side . . . ." Because she was living with the Chasses at the time and was not comfortable with the situation in her own home, Mosman testified that she had wanted to appease Chasse with the contents of the letter.

Following this testimony, the defendant again attempted to introduce the letter. The trial court refused to permit it, noting that the letter was not proper impeachment material in that the defendant had failed to establish any connection between it and Mosman's trial testimony.

## A

The defendant first argues that the trial court improperly excluded the letter in that it constituted a prior inconsistent statement. He contends that while Mosman testified on cross-examination that she considered herself to be a truthful person, she had stated a contradictory opinion in the November, 1991 letter. Consequently, the letter should have been admitted for the purpose of impeaching Mosman's veracity.

"It is well established that the trial court has broad discretion in ruling on the admissibility and relevancy of evidence. *State* v. *Miller*, 202 Conn. 463, 482, 522

A.2d 249 (1987). A court's ruling on such evidentiary matters will not be reversed unless the defendant shows a clear abuse of discretion. *State* v. *Watkins*, 14 Conn. App. 67, 73, 527 A.2d 1157, cert. denied, 208 Conn. 804, 545 A.2d 1102 (1988)." *State* v. *Quinones*, 21 Conn. App. 506, 513, 574 A.2d 1308, cert. denied, 215 Conn. 816, 576 A.2d 546 (1990).

"It is an elementary rule of evidence that the credibility of a witness may be attacked by showing a materially inconsistent prior statement." *G & R Tire Distributors, Inc.* v. *Allstate Ins. Co.*, 177 Conn. 58, 60–61, 411 A.2d 31 (1979). While this is true, "[t]o be admissible, the court must first be persuaded that the statements are indeed inconsistent." *State* v. *Piskorski*, 177 Conn. 677, 710, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979). "Whether there are inconsistencies between the two statements is properly a matter for the trial court. . . . In determining whether an inconsistency exists, the testimony of a witness as a whole, or the whole impression or effect of what has been said, must be examined." (Citations omitted.) *State* v. *Whelan*, 200 Conn. 743, 748 n.4, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

In this case, Mosman was asked on cross-examination, "Would you consider yourself to be a truthful person?" She answered "Yes," in effect that, at that point in time, she considered herself truthful. The defendant offered the letter, which had been written approximately one year prior to the trial, as an inconsistent statement. In the letter, Mosman indicated that in November, 1991, she had been lying and intended to stop doing so. Mosman did not testify at trial that she had never lied or that in November, 1991, she considered herself to be a truthful person. It is entirely consistent that a person who considered herself untruthful could, one year later, have reassessed that

opinion. As the trial court stated, "This letter says: I am going to try hard to stop. And, who am I and who is anyone, except through the avenue of cross-examination, to determine if she stopped and when she stopped." Considering Mosman's explanation of why she had written the letter, it was well within the trial court's discretion to determine that Mosman's two statements were not inconsistent.

The defendant also argues that the letter was admissible as an admission of specific misconduct showing a lack of veracity. He makes this claim for the first time before this court. "It is a rule of long standing that in the absence of exceptional circumstances, claims of error not raised distinctly at the trial will not be reviewed on appeal." *Saradjian* v. *Saradjian*, 25 Conn. App. 411, 419, 595 A.2d 890 (1991); see Practice Book § 4185. "Nothing in the record before us establishes that this case presents exceptional circumstances warranting departure from our well-established rule limiting appellate review to claims distinctly raised in the trial court." *Chaplin* v. *Balkus*, 189 Conn. 445, 447, 456 A.2d 286 (1983). Accordingly, we decline to review this claim.

## B

The defendant also argues that the trial court's ruling violated his right to confront and cross-examine an adverse witness as guaranteed by the sixth amendment to the federal constitution[4] and article first, § 8, of the Connecticut constitution.[5] He contends that the exclusion of the letter and, consequently, of cross-examination regarding the letter prevented him from

---

[4] The sixth amendment to the United States constitution provides in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

[5] Article first, § 8, of the Connecticut constitution provides in pertinent part: "In all criminal prosecutions, the accused shall have a right . . . to be confronted by the witnesses against him . . . ."

adequately exploring Mosman's veracity and bias, issues that reflected on her credibility as a witness. We disagree.

"The primary interest secured by the confrontation clause of the sixth amendment is the right to cross-examination. *Douglas* v. *Alabama*, 380 U.S. 415, 418, 85 S. Ct. 1074, 13 L. Ed. 2d 934 (1965); *State* v. *Randolph*, 190 Conn. 576, 591, 462 A.2d 1011 (1983); *State* v. *Wilson*, 188 Conn. 715, 720, 453 A.2d 765 (1982)." *State* v. *Milum*, 197 Conn. 602, 608, 500 A.2d 555 (1985). The sixth amendment is satisfied when the defendant is "permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Davis* v. *Alaska*, 415 U.S. 308, 318, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); *State* v. *Castro*, 196 Conn. 421, 425, 493 A.2d 223 (1985).

" 'The confrontation right, however, is not absolute and is subject to reasonable limitation. *State* v. *Vitale*, 197 Conn. 396, 401, 497 A.2d 956 (1985).' " *State* v. *Lewis*, 220 Conn. 602, 621, 600 A.2d 1330 (1991). "The extent of cross-examination beyond that necessitated by the constitution rests within the discretion of the trial court." Id., 622. Therefore, our courts first determine whether the defendant's cross-examination satisfied the sixth amendment standards as enunciated in *Davis* v. *Alaska*, supra, 415 U.S. 318. If so, "[t]he general rule is that further restrictions on the scope of cross-examination are within the sound discretion of the trial judge. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Castro*, supra, 196 Conn. 424–25. " ' "To establish an abuse of discretion, [the defendant] must show that the restrictions imposed upon [the] cross-examination were clearly prejudicial." . . . Once it is established that the trial court's ruling on the scope of cross-examination is not constitution-

ally defective, this court will apply '[e]very reasonable presumption . . . in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion.' " (Citations omitted.) Id., 426.

Our threshold inquiry, then, is whether the defendant's cross-examination of Mosman satisfied the principle enunciated in *Davis* v. *Alaska,* supra, 415 U.S. 318. The defendant proposed to introduce the letter and then to inquire about it on cross-examination in order to impeach Mosman's veracity. The defendant, however, was otherwise permitted to explore her character for truthfulness. On direct examination, Chasse testified that Mosman was a chronic liar, as did Annie Laccone, the defendant's mother. On cross-examination, Mosman was asked extensively about her troubled background and inconsistencies between her two statements. "In determining whether the cross-examination of [Mosman] was unduly restricted it is the entire cross-examination which we must examine." *State* v. *Asherman,* 193 Conn. 695, 721, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985). Using this standard, we must conclude that the defendant's rights were not violated. The defendant was permitted to expose the jury to sufficient facts from which it could pass on Mosman's veracity. The constitutional threshold having been satisfied, it was within the trial court's discretion whether to admit further evidence on that issue. We cannot conclude that the court abused its discretion in excluding the letter.

The defendant also asserts on appeal that the letter went to the issue of Mosman's bias. That is, he claims that cross-examination regarding the letter would have shown that Mosman harbored resentment toward Chasse. Such evidence, he concludes, would reasonably tend to indicate that Mosman's testimony might be influenced by bias.

"Cross-examination regarding motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. *State* v. *Corley*, 177 Conn. 243, 246, 413 A.2d 826 (1979)." *State* v. *Vitale*, 197 Conn. 396, 402, 497 A.2d 956 (1985).[6] The defendant claims that the trial court's ruling prevented him from exposing the jury to facts tending to show bias. We note, however, that the theory on which the defendant offered the letter at trial did not implicate bias. The purpose of the defendant's offer was to impugn Mosman's general veracity, not her bias against Chasse.

It is clear from the record that the defendant was allowed wide latitude to cross-examine Mosman on issues relating to credibility. Under the circumstances, we cannot conclude that the defendant was denied his constitutional right of confrontation. "Every evidentiary ruling which denies a defendant a line of inquiry to which he thinks he is entitled is not constitutional error. In this instance, the defendant has put a constitutional tag on a nonconstitutional claim. *State* v. *Gooch*, 186 Conn. 17, 18, 438 A.2d 867 (1982)." *State* v. *Vitale,* supra, 197 Conn. 403.

We conclude that the trial court did not improperly exclude from evidence the November 21 letter.

## II

The defendant next claims that the trial court improperly precluded him from presenting evidence of Mosman's bias through the direct examination of a defense witness. In that he failed to take an exception when

---

[6] Social relationships may "have a tendency to show bias. When the issue involves the relationship between a witness and a party, cross-examination of the witness to demonstrate this relationship is a matter of right which may not be unduly restricted. *Alford* v. *United States*, 282 U.S. 687, 51 S. Ct. 218, 75 L. Ed. 624 (1931). This may also be true in many cases involving the relationship of witnesses to each other." *State* v. *Asherman*, supra, 193 Conn. 720.

the trial court sustained the state's objection to his line of inquiry, the defendant concedes that this claim is unpreserved. He maintains, however, that this claim is entitled to review pursuant to the doctrine of *State v. Evans*, 165 Conn. 61, 70, 327 A.2d 576 (1973), as reformulated in *State v. Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[7] Beyond his mere assertion that this claim implicates the sixth amendment to the federal constitution and article first, § 8, of our state constitution, the defendant presents us with no analysis to support his claim for *Evans-Golding* review. Because the defendant has failed to brief this issue adequately, we will not review it. Practice Book § 4065; *State v. Cain*, 25 Conn. App. 503, 524, 596 A.2d 449 (1991), aff'd, 223 Conn. 731, 613 A.2d 804 (1992).

## III

In his final claim, the defendant argues that the trial court's instructions unconstitutionally diluted the state's burden of proving guilt "beyond a reasonable doubt."[8] Although the defendant did not take an excep-

[7] "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." *State v. Golding*, supra, 213 Conn. 239–40.

[8] The defendant challenges the following jury instructions, given by the trial court as part of its final charge: "The burden of proving the defendant guilty beyond a reasonable doubt requires that the state produce sufficient evidence to create in your minds a strong and abiding conviction in the guilt of the defendant. The evidence must be so sufficient that it leaves no room in your minds for any presumption of the defendant's innocence.

"The term reasonable doubt has no technical or unusual meaning. You can understand and appreciate its real meaning by placing emphasis on the word reasonable. A reasonable doubt is not a doubt raised by someone for the sake of raising a doubt. It is not a conjecture, it is not a guess, it is not a surmise. A reasonable doubt is not hesitation springing from feelings of sympathy or pity. A reasonable doubt is a doubt founded upon the

tion to the instructions on this theory, he once again claims review under the *Evans-Golding* doctrine.

As the defendant concedes, the challenged instructions are similar to jury instructions that have repeatedly been approved by our Supreme Court. See, e.g., *State* v. *Campbell,* 225 Conn. 650, 661, 626 A.2d 287 (1993); *State* v. *Gomez,* 225 Conn. 347, 353–54, 622 A.2d 1014 (1993); *State* v. *Adams,* 225 Conn. 270, 290–91, 623 A.2d 42 (1993); *State* v. *Ireland,* 218 Conn. 447, 457, 590 A.2d 106 (1991); *State* v. *Dyson,* 217 Conn. 498, 504–505 n.3, 586 A.2d 610 (1991). In such cases, the court concluded that similar instructions did not unconstitutionally dilute the state's burden of proof when viewed in the context of the entire charge. See *State* v. *Lytell,* 206 Conn. 657, 664, 539 A.2d 133 (1988) (test whether jury charge as whole presents case adequately to jury so that no injustice is done). The defendant has thus failed to establish a clear violation of a fundamental constitutional right as required by the third prong of the test set forth in *State* v. *Golding,* supra, 213 Conn. 239–40.

Controlling precedent notwithstanding, the defendant suggests the possibility that our Supreme Court may want to revisit this matter. We leave his invita-

---

evidence. It is a doubt that grows out of the evidence or lack of evidence in a particular case. It is a doubt for which you, in your minds, can give a reason based upon the evidence or lack of evidence. A reasonable doubt is a square and honest doubt. It is the kind of doubt that would make a reasonable person hesitate to act.

"If the facts that you find to have been proven can reasonably be explained in any other way than that the defendant is guilty, you must of course render your verdicts in his favor. Absolute certainty in the affairs of life, however, is almost never obtainable. And, the law does not require absolute certainty on the part of the jury to authorize guilty verdicts.

"What is required, ladies and gentlemen, is that guilt must be proven beyond a reasonable doubt. Proof beyond a reasonable doubt is proof of a sufficiently convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his or her own affairs."

tion to that court and conclude that his claim before this court must fail.

The judgment is affirmed.

In this opinion the other judges concurred.